## A96A0479. MOONEY v. THE STATE.
### (471 SE2d 904)

McMURRAY, Presiding Judge.

Defendant was tried before a jury on a multicount indictment and found guilty of two counts of obstruction of a law enforcement officer, and one count each of aggravated assault, speeding, attempting to elude, reckless driving, driving under the influence, endangering a child under 14 while driving under the influence, being an habitual violator, running a stop sign, hit-and-run, failure to yield the right-of-way, and driving with marijuana in his blood. Defendant was acquitted of one count of aggravated assault (Count 1), one count of aggravated assault upon a peace officer (Count 4) and also acquitted of one count of hit-and-run (Count 14). The trial court further directed a verdict of acquittal as to a charge of improper backing (Count 16). The evidence revealed that defendant was arrested as the sole occupant of a vehicle under the following circumstances: On the evening of October 16, 1993, Gilmer County Deputy Sheriff Jerry Max Frady was driving a marked sheriff's patrol car on Georgia Highway 52, headed toward Ellijay, when he received "radio traffic from Pickens County to be on the lookout for a late model dark green Camaro." This green Camaro was "traveling north on Highway 515 at a high rate of speed running traffic off of the road." Officer Ken Brooks of the East Ellijay Police Department was already in pursuit. Deputy Frady turned "up the on ramp to 515 to the northbound lane," and spotted the Camaro in the midst of "pretty good traffic then." As soon as Deputy Frady "got in behind him the car veered halfway off the road across the white line, at least half of his car." Deputy Frady radioed the Camaro's tag number into Gilmer County. He then "activated [his] lights — [his] blue lights and . . . headlights. And the Camaro pulled to the right shoulder of the road." Deputy Frady parked behind the Camaro, exited his car, and approached the Camaro. He was wearing "blue jeans, a sheriff's department investigator shirt with . . . emblem, and a sheriff's department jacket with patches." He wore his "badge on the right hand side of [his] belt." The driver of the Camaro "never rolled the windows down," nor attempted to acknowledge Deputy Frady. Instead, he remained in the car, "revving the motor. . . ." Deputy Frady started

back toward his car, intending to "get on the PA. Tell him to cut the motor off and roll his window down." Instead, the driver "spun out, crossed both lanes of northbound 515 to the left, crossed the cross section of the median — which is paved, spinning the whole way, [and] headed south on 515." Officer Brooks of East Ellijay approached with lights and siren already activated. Officer Brooks cut across the median. "The green Camaro went by him and he took in after him." As the Camaro approached a traffic light, "the light was red. And there was traffic sitting in both lanes of 515 South and both of the turning lanes — stopped. . . . And there was traffic crossing 515 at the red light." Defendant, the driver of the Camaro, "slid. He locked brakes, slid, went up on the curve to the right and passed the traffic around to the right in the grass." Traffic scattered. Deputy Frady and Officer Brooks continued their pursuit, following the Camaro at speeds "[i]n excess of a hundred and fifteen miles an hour." If there were cars in the driver's path, "he'd pass 'em in the grass on the left hand side. . . . [T]hen he'd get back over in the right hand lane. And if there was a car in the right hand lane he'd pass 'em on the grass in the right hand lane." Three miles south of East Ellijay, defendant "slowed down to about ninety-five miles an hour. . . ." The chase was "quickly approaching the off ramp at Old 5 — running in excess of a hundred and he got nearly to the off ramp and just locked it up and slid straight down the highway. [Deputy Frady] was directly behind him and chunks of tire . . . [flew] over the top of [Deputy Frady's] car." The Camaro slowed enough to start "down the off ramp." There, defendant confronted a van coming up from 515 and "a car coming south on Old 5. He went between them, in the mud, in the grass and between them and hit Old 5 going south." By now, Deputy Frady thought he observed "two white males in the car. [He] could see two heads in the car." As he followed the Camaro into Pickens County, Deputy Frady saw the "passenger side window [roll] down and they start throwing what appeared to be trash out the window." Traveling "[p]lenty in excess of a hundred miles an hour," it was all Deputy Frady could do "to stay on the road and stay with him." Before reaching the "Y" at Talking Rock, where "Old 5 and 136 and the on ramp to 515 come together," Deputy Frady saw a "marked unit with lights flashing. . . ." "The Camaro started to slow at the curve and slid . . . in the curve and nearly c[a]me to a complete stop." When the Camaro nearly stopped, the "passenger side door c[a]me open — completely open and a woman holding a small child in her arms turned and got her legs all of the way out of the car on the ground to exit the vehicle." But then defendant in the Camaro "sped east — just floored it. . . . And the door was coming back and the woman got her legs back up in the car." Defendant accelerated and "went on up 136, continued back up to a high rate of

speed." As defendant approached the stop sign at the intersection of the 136 Connector and 53, he "locked it up and slid — slid through the intersection and t-boned a white four door car in the passenger door. T-boned it hard." Deputy Frady "pulled [his] unit in front of him to block him and notified dispatch that [the driver] was wrecked at 136 and 53. . . ." "The female and the child exited [the Camaro] on the passenger's side . . . and went directly behind [Deputy Frady's patrol] car." As Deputy Frady exited his car, defendant "kicked it backwards — like attempting to go back up this highway. . . . He backed up in this lane — not all the way across but . . . [nevertheless into] oncoming traffic." "Deputy Frady attempted to back his car in front of the Camaro but defendant "sped out . . ." hitting Deputy Frady's vehicle in "the left front corner of the front bumper." Defendant drove "straight down Carver Mill [Road,] and [Deputy Frady] pursued." As Deputy Frady reached the top of a hill, the "pavement ended. Where the pavement ended there was white gravel and you could see where he'd went all over the road. [Deputy Frady] continued down through there probably no more than three hundred yards and there sat the green Camaro plowed into a pine tree[,] on the driver's side front bumper into the pine tree. . . . There was a woman standing in the yard. . . . She was pointing. 'He went up in the field. He's up in there.' " Deputy Frady saw "a guy in a white shirt run in the woods. . . . About twenty-five yards up into the woods there was a fence and the guy in the white shirt was crouched down by the fence." As Deputy Frady entered the woods, "the guy come back at me. The Defendant in the shirt — white shirt, come back at me." Deputy Frady "told the Defendant to stop and get on the ground. . . . As soon as I said that he came up with his right hand and had an object in his right hand that I thought was a knife. I told him to stop again. As he come up I pulled the gun and shot. . . . [Defendant] went directly to his right through the woods." Deputy Frady followed and, as he approached, "identified [himself] as Deputy Max Frady of the Gilmer County Sheriff's Department and [told defendant that] he was under arrest. What he needed to do was lay down on the ground." Defendant was argumentative, vituperative, and did not comply with Deputy Frady's directive. Defendant "kept saying over and over, 'Kill me. Kill me [d____] or I'll kill you. Kill me you [s__ o_ a b____] or I'll kill you.' He kept shouting that over and over. And [Deputy Frady] kept telling [defendant], 'Your [sic] under arrest. What you need to do is lay down on the ground. . . . [They] stood in a verbal argument there for just a minute and [Deputy Frady] approached [defendant]. [Defendant . . .] was on a uphill angle [from Deputy Frady]. Just as [Deputy Frady] approached . . . [defendant] took about three — two or three running steps and hit me right chest high with his shoulder." As they rolled and grappled,

defendant "had the leverage and just body slammed [Deputy Frady] right against a tree — backwards." Deputy Frady saw his pistol "on the ground up above [them] which scared [him . . . because he did not know if defendant] still had the knife or what." Determined to regain control of the situation, Deputy Frady "kicked [defendant in] the center of the chest and [defendant] done a flip backwards off the hill. . . . [Deputy Frady] started towards him. [Defendant] started right back up. We done this about three times." Assistance finally arrived from the "State Patrol, Pickens County uniformed officer and investigator Craig," who had to wrestle with defendant in order to subdue and handcuff him. A closed knife was found on the ground. Defendant testified in his own behalf and admitted consuming at least "[t]hree beers and — uh — probably about two good drinks off of — uh — some liquor," before he drove that afternoon and evening.

Defendant's motion for new trial was denied, and this appeal followed. *Held*:

1. Defendant enumerates the general grounds, contending the chase and arrest were illegally initiated by an officer improperly dressed, in that Deputy Frady was not in uniform as required by OCGA § 40-6-395 (a). As a result, he argues, all evidence obtained pursuant to the illegal arrest would be inadmissible.

"[N]o violation of [former] Code Ann. § 68A-904 (a) [now OCGA § 40-6-395 (a)] is shown unless the evidence demonstrates that the officer allegedly eluded was in the required uniform and that his vehicle was appropriately marked." *Phillips v. State*, 162 Ga. App. 471 (2), 472 (291 SE2d 776). But the evidence in the case sub judice was that Deputy Frady was wearing a black Gilmer County investigator's shirt with emblem under a brown Gilmer County Sheriff's Department jacket depicted in State's exhibits when he attempted to approach defendant's vehicle; that his badge was displayed on his belt; that the vehicle Deputy Frady drove was appropriately marked with the proper insignia for the Gilmer County Sheriff's Department; and that Deputy Frady employed both his flashing lights and his siren in attempting to apprehend defendant. "The testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-4-8. "Conflicts in the testimony of the witnesses, including the [S]tate's witnesses, is a matter of credibility for the jury to resolve. [Cits.] As long as there is some [competent] evidence, even though contradicted, to support each fact necessary to make out the [S]tate's case, the jury's verdict will be upheld. [Cit.]" *Searcy v. State*, 236 Ga. 789, 790 (225 SE2d 311). In the case sub judice, the evidence that Deputy Frady displayed a variety of objective indicia of his lawful authority was sufficient to authorize the jury's determination that defendant was unlawfully attempting to elude, as alleged in Count 7 of the indictment. *Lester v. State*, 253 Ga. 235, 239 (5) (320 SE2d 142). The

enumeration of the general grounds is without merit.

2. In his second enumeration of error, defendant contends the trial court erred in failing to grant his renewed motion for mistrial made after the trial court allegedly commented on the evidence in the presence of the jury.

During cross-examination of Deputy Frady, defendant asked whether the deputy's own actions in chasing defendant through East Ellijay at speeds of 100 miles per hour itself jeopardized public safety. The State's attorney interposed a relevancy objection, and the trial court observed: "I don't think the law requires an officer to break off a chase. He's told you the policy. The mere fact that an officer tries to stop a man that may be going down the highway — and he's testified what happened. I don't know of any law that requires he break off the chase."

OCGA § 17-8-57 provides: "It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused." In applying this Code section, it must be recognized there is a difference between evidence and proof. " 'Evidence tends to establish or disprove an alleged matter of fact in issue. Proof is the effect of evidence, while evidence is merely the means of making proof. A fact is not proved unless it is established.' . . . [Cit.]" *Jackson v. State*, 177 Ga. 264, 265 (170 SE 26). "Generally what the court says in stating to counsel the reason for denying a motion to exclude or rule out evidence is, if pertinent to the question raised by counsel, not error, although the reason given involve a statement as to certain testimony which is already in, or as to there being nothing in evidence showing that the circumstances are as the counsel claim." *Croom v. State*, 90 Ga. 430, hn. 3 (17 SE 1003). " 'The only practicable rule is, to treat the jury as possessed of common sense, and as capable of understanding what is addressed by the judge *to them* and *what is not*. He may not express *to the jury* any opinion; but if in the decision of any legal question, as it arises, he must pass upon facts, the statute does not apply. It must be reasonably construed.' [(Emphasis in original.)]" *Chapman v. State*, 23 Ga. App. 359, 361 (98 SE 243). In the case sub judice, we find no impermissible expression of opinion to the jury as to what has been proved by the trial court's reference to Deputy Frady's testimony during colloquy with counsel respecting an evidentiary ruling.

3. Defendant contends the trial court erred in admitting evidence of blood tests, showing his blood alcohol concentration to be .09 grams percent, over his objection that the implied consent warning was defective. State's Exhibit 31 is a videotape made from the patrol car of Trooper Tim Nichols of the Georgia State Patrol. In this tape, Trooper Nichols read defendant an implied consent warning three

times, each time informing defendant of his right to an additional chemical test at his own expense. Defendant complains that this warning failed to inform him that he further had the right to insist that any such additional chemical test be given by *qualified persons of his own choosing*.

Under the law applicable to this arrest, made on October 16, 1993, a defendant was not entitled to an implied consent warning that tracked the exact language of the implied consent statute, former OCGA § 40-5-67.1 (b) (amended, effective April 21, 1995). *Howard v. Cofer*, 150 Ga. App. 579 (2), 580 (258 SE2d 195). Nevertheless, to omit reference to the right of the accused to have any additional chemical test performed by qualified persons of his own choosing was a fatal flaw, under OCGA § 40-6-392 (a) (3), rendering the State-administered test results inadmissible at trial. *State v. Causey*, 215 Ga. App. 85 (449 SE2d 639). This continues to be the case using the legislatively prescribed warning established under existing OCGA § 40-5-67.1 (b) (2). Accordingly, we hold the trial court in the case sub judice erred in admitting, over defendant's timely objection, the results of the State-administered test of defendant's blood. Nevertheless, we find that error to be harmless, due to the overwhelming evidence that defendant, having engaged in a 29-mile high-speed chase which caused a wreck and endangered lives, was a less safe driver as alleged in Count 9 of the indictment, after his admitted use of alcohol. Evidence of defendant's blood alcohol level merely corroborated other evidence, including defendant's own statements, that he "had been drinking heavily. Therefore, it is highly probable that this [erroneously admitted] evidence did not contribute to the verdict, and [the] error in admitting it was harmless. *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976)." *Johnson v. State*, 146 Ga. App. 835, 836 (3) (247 SE2d 513).

4. Defendant enumerates the denial of his motion for new trial on the special ground of ineffective assistance of counsel. He argues that trial counsel should have moved before trial to exclude all evidence, on the basis that his arrest was unlawful because Deputy Frady was not in proper uniform at the time he initiated the chase. Since we have already held in Division 1 that the evidence is sufficient to authorize the conclusion that Deputy Frady was properly attired, the failure of trial counsel to bring such a motion does not raise a reasonable probability that the outcome of the trial would have been different. Consequently, defendant has failed to establish one of the necessary prongs to a successful challenge to his conviction due to alleged ineffective assistance of counsel. *Johnson v. State*, 216 Ga. App. 858 (1), 860 (456 SE2d 251).

*Judgment affirmed. Johnson, J., concurs. Ruffin, J., concurs in the judgment only.*

DECIDED MAY 14, 1996.

*Richard Thurman*, for appellant.

*Roger G. Queen, District Attorney*, for appellee.